## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **SHANEA K. ESTES,**<br>c/o Whittaker Law, LLC<br>2055 Reading Road, Suite 260<br>Cincinnati, Ohio 45202<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**UNIVERSITY OF CINCINNATI,**<br>c/o Office of General Counsel<br>368 University Hall,<br>51 Goodman Drive<br>Cincinnati, Ohio 45221<br><br>**and**<br><br>**UNIVERSITY OF CINCINNATI**<br>**MEDICAL CENTER, LLC,**<br>c/o Registered Agent:<br>GH&R Business Services, Inc.<br>312 Walnut Street, Suite 1800<br>Cincinnati, Ohio 45202<br><br>and<br><br>**JANE E. STRASSER, Ph.D., in her**<br>**capacity as a public official acting**<br>**under color of State law,**<br>994 Sunview Drive East<br>Hamilton, Ohio 45013<br><br>and<br><br>**DOE DEFENDANTS ONE, TWO,**<br>**THREE, FOUR, AND FIVE, in their**<br>**capacities as public officials acting**<br>**under color of State law,**<br><br>      **Defendants.** | Case No. _____<br><br>**Judge:** _____<br><br>          **COMPLAINT**<br>       **AND JURY DEMAND** |

**COMES NOW** Plaintiff Shanea K. Estes, by and through counsel, and for her Complaint and Jury Demand against Defendants the University of Cincinnati, the University of Cincinnati Medical Center, LLC, Jane E. Strasser, Ph.D., in her capacity as a public official acting under color of State law, and Doe Defendants One, Two, Three, Four, and Five in their official capacities acting under color of State law, states as follows:

### NATURE OF THIS ACTION

1.　　This civil action arises from the violations of Defendants the University of Cincinnati ("UC") and the University of Cincinnati Medical Center, LLC ("UC Medical Center") (collectively "UC" or "Defendants" unless otherwise indicated) of the rights of Plaintiff Shanea K. Estes under Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq*. ("Title IX"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII").

2.　　At all times relevant to this Complaint, Plaintiff was a "contractor" doing research as a visitor from her home institution, Vanderbilt University ("VU") at UC's facilities upon receiving grants from the United States Departments of Defense ("DOD") and National Institutes of Health ("NIH"). Plaintiff alleges that she was subjected to discrimination, abuse, assault, and retaliation on the basis of her sex at the hands of UC employee and student Jeffery S. Crocker, and when UC disregarded, failed to investigate, and retaliated against her for objecting to the same, in violation of Title IX and Title VII, such that UC was deliberately indifferent to Plaintiff's complaints.

3.　　Plaintiff also alleges that Defendants Jane M. Strasser, Ph.D., and Doe Defendants One, Two, Three, Four, and Five (collectively "the Doe Defendants" unless

2

otherwise indicated), in their official capacities as public employees acting under color of state law, violated her minimal due process rights arising under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983 ("Section 1983"), when they investigated, took materially adverse action against, and failed to allow her to defend herself from allegations of academic wrongdoing without notice or the opportunity to be heard, thereby destroying her ability to earn a living in her chosen field.

## PARTIES, JURISDICTION, AND VENUE

4.  Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

5.  Plaintiff Shanea K. Estes is a resident of Campbell County, Kentucky. At times relevant to this Complaint, Plaintiff was a resident of Tennessee.

6.  Defendant the University of Cincinnati ("UC") is a public research university organized under the laws of the State of Ohio with a principal place of operations in Hamilton County, Ohio. At all times relevant to this Complaint, UC has received State and federal funding and financial assistance within the meaning of Title IX.

7.  Defendant the University of Cincinnati Medical Center, LLC ("UC Medical Center"), is a limited liability company organized under the laws of the State of Ohio, and a public teaching hospital and research center, with its principal place of operations in Hamilton County, Ohio. At all times relevant to this Complaint, UC Medical Center has also received State and federal funding and financial assistance within the meaning of Title IX.

8.     Defendant Jane E. Strasser, Ph.D., is a resident of Butler County, Ohio.  At all times relevant to this Complaint, Dr. Strasser has been an employee of UC, and public official acting under color of state law within the meaning of Section 1983.

9.     Upon information and belief, at all times relevant to this Complaint, the Doe Defendants have been employees of UC, and public officials acting under color of state law within the meaning of Section 1983.

10.     This Court has personal jurisdiction over the parties to this civil action and federal question subject matter jurisdiction over the controversy alleged in this Complaint under 28 U.S.C. §1331.

11.     Venue is appropriate in this Court under 28 U.S.C. §1391(b) because the facts, occurrences, transactions and series of facts, occurrences, and transactions giving rise to this Complaint took place in this federal judicial District.

## FACTS

### Plaintiff's Engagement with UC

12.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

13.     In 2012, Plaintiff earned bachelor's degrees in biology and animal science from North Carolina State University.

14.     Between 2014 and 2018, Plaintiff participated as a research assistant at VU with federal funding from the NIH and DOD.

15.     In 2018, Plaintiff earned a master's degree in laboratory investigation from VU.

16.     Between 2018 and 2021, Plaintiff was a research assistant at the University of Michigan.

17.     At all times relevant to this Complaint, Defendants have received State and federal funding and financial assistance within the meaning Title IX

18.     On or about March 31, 2021, UC recruited Plaintiff as a volunteer affiliate, contractor, and visiting scientist in its Department of Internal Medicine, Division of Cardiovascular Health and Diseases at the University of Cincinnati College of Medicine, under the supervision of Dr. Deeptankar DeMazumder, with her salary paid by the DOD and other grants to her home institution, Vanderbilt University Medical Center ("VUMC").

19.     These federal grant funds were also provided by VUMC to UC as sub-award contracts to support the full-time work done by Plaintiff at UC, including without limitation paying for her access to lab space, equipment, animals, and mentorship in the Section of Cardiac Electrophysiology, Division of Cardiovascular Health and Disease, Department of Internal Medicine, College of Medicine at UC.

20.     Plaintiff's duties at UC also involved matters related to active and future grants, training, and experiments under Dr. DeMazumder's supervision.

21.     Plaintiff's position at UC was to be effective from March 29, 2021, through March 31, 2022, and was later extended through May 2023.

22.    Upon recruiting her, UC informed Plaintiff as follows:

All rights to and interests in discoveries, inventions, or patents which result from research or investigation conducted within the scope of your volunteer appointment; or in any university facility; or with funding, equipment or infrastructure provided by the university, shall be the sole property of the university. By accepting this appointment, you agree to be bound by university policies on copyrights and patents.

23.    Upon accepting the position offered by UC, on or about April 1, 2021, UC assigned Plaintiff an Affiliate ID and issued her a "Contractor" "Bearcat Badge" that gave her access to its Laboratory Animal Medical Services ("LAMS") facilities.

24.    The terms of Plaintiff's recruitment also included working on intellectual property, like patent applications filed by UC containing claims by VUMC and the federal government.

25.    UC supplied Plaintiff with orientation and training related to its facilities and computer networks led and scheduled by its employees.

26.    UC assigned Plaintiff a "uc.edu" email address.

27.    At all times relevant to this Complaint, Plaintiff was supervised by employees of UC.

28.    At all times relevant to this Complaint, Plaintiff took instruction from employees of UC.

29.    At all times relevant to this Complaint, Plaintiff's access to UC's facilities and her research funded by the federal government was controlled by UC.

30.    At all times relevant to this Complaint, Plaintiff reported her concerns, objections, and complaints discussed below to UC employees, including without limitation personnel in UC's human resources and Title IX offices.

## **Crocker's Harassment, Abuse, and Assault of Plaintiff**

31.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

32.     Between 2017 and December 2022, UC employed Ph.D. student Jeffrey S. Crocker in the same facilities used by Plaintiff to do research paid for by the federal government.

33.     In January 2021, Crocker was caught falsifying data and taking credit for work done by his colleagues in his Ph.D. dissertation and NIH F31 grant reports.  Dr. DeMazumder and others instructed Crocker to revise his report to show only his data or lack thereof.

34.     Program Director Dr. Roger Worrell intervened on Crocker's behalf, however, by (a) temporarily suspending him with pay, thereby relieving him of duties typical of senior graduate students, and (b) entering into a written agreement with him whereby Crocker would behave respectfully toward lab members, not damage lab equipment, not take credit for the work of his colleagues, and report on time for his duties, etc.

35.     Upon information and belief, Dr. Worrell knew these strategies would not work but wanted to keep Crocker in the graduate program to prevent the program's ranking from slipping.

36.     Crocker's Ph.D. dissertation committee also imposed a strict policy requiring him to provide a detailed monthly written report on his alleged original work on the first day of every month.  Upon information and belief, he failed to do so without

7

consequence. Instead, Mr. Crocker didn't report for his lab assignments and boasted that he could work whenever he wanted because he had his own NIH grant.

37. On April 1, 2021, upon information and belief Crocker reported to his Ph.D. committee that he hadn't provided any reports or data on his original work because he was going through a divorce. Again, Dr. Worrell intervened by excusing Crocker from reporting his own work and giving him time off.

38. Crocker was allowed to return to the lab in the fall of 2021 to continue doing nothing in particular.

39. By that time, Plaintiff had started making remarkable progress on her research after spending almost a year building her experimental setup.

40. The Chair of Internal Medicine, John Byrd, MD, was enamored with Plaintiff's work and progress and held her out to UC as an example of a high-achieving female scientist.

41. Instead of learning from Plaintiff's hard work and success, Crocker's attitude worsened. He often referred to Plaintiff and other female colleagues and senior faculty in derogatory terms like "bitches."

42. Despite Crocker's attitude and conduct, Plaintiff tried to help him advance his work since they were in the same lab together, and ostensibly working toward similar goals.

43. Crocker thanked Plaintiff by continuing to refer to her and other women in demeaning terms and treating her as inferior because she is a woman.

44. Crocker didn't refer to male coworkers in similarly derogatory terms. Nor did he treat male coworkers as subordinates or as his inferiors.

45. In February 2022, Plaintiff and others discovered that Crocker was falsifying Plaintiff's research data as his own in his reports to his Ph.D. dissertation committee and the NIH. Plaintiff objected. When she did so, Crocker retaliated by accusing her of research misconduct and threatened to shut down the lab and prevent her from doing her work at UC, which would effectively destroy her career if successful.

46. In the same time period, Crocker also stalked, menaced, and assaulted Ms. Estes in a UC facility upon learning that she reported his conduct to his Ph.D. co-advisors, who subsequently reported the same to Drs. Worrell and Byrd. While Plaintiff escaped serious bodily injury, she was terrified and in shock for days and is still recovering.

**Retaliation directed at Plaintiff by UC, Dr. Strasser, and the Doe Defendants**

47. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

48. Drs. Worrell and Byrd ignored Plaintiff's objections and complaints about Crocker's conduct, and upon information and belief did no meaningful investigation, and took no corrective action.

49. Thus, Plaintiff and another similarly situated female colleague, Pooja Joshi, reported Crocker's conduct as targeted harassment, discrimination, and retaliation based on sex and gender to Human Resources, the Title IX Coordinator, the Director of LAMS, and other faculty, officials, and administrators at UC.

50.     Upon information and belief, Human Resources and the Title IX Coordinator did no meaningful investigation.  Instead, they advised Plaintiff to abandon her research and leave UC to avoid being physically harmed by Crocker.

51.     On or about March 15, 2022, UC "suspended" Plaintiff's facilities access "pending investigation of issues that have recently been discovered.  As a result, access to the lab space will be temporarily suspended to allow the investigation to proceed."  In addition, UC suspended the badge access of "collaborators" who "are not students, faculty, or staff of the University of Cincinnati."  This suspension, therefore, applied to Plaintiff but not Crocker.

52.     UC's Human Resources personnel advised Plaintiff that her lab had been shut down, ostensibly to shield her from contact with Crocker.

53.     On April 4, 2022, Plaintiff and Dr. Joshi requested help from Senior Associate Dean of Research Melanie Cushion, Ph.D., and Associate Dean of Graduate Education Timothy LeCras, Ph.D., based on Crocker's conduct:

> Dear Dr. Cushion,
>
> It has been 3 weeks since our research at UC was suspended. Please let us know if there are any updates on the investigation and when we should expect to resume our work and access to the lab.
>
> To recap:
> 1) Jeff Crocker, PSP PhD student, has been taking credit for our work. He has misrepresented our work and work by others as being his own "accomplishments" to his PhD thesis committee and in Figures 1 and 2 of his NIH F31 RPPR. Some of these data weren't even collected/analyzed at UC and belong to Vanderbilt.
> 2) After we discussed our concerns with Jeff, he expressed violent/abusive behavior towards us and threatened to retaliate by filing bogus complaints and shutting down the entire lab and our work.
> 3) We informed Dr. DeMazumder via the attached email about his threats. I understand Dr. DeMazumder informed the Chair of Jeff's thesis committee and Jeff's Program Director. After this, the lab was shut down as indeed Jeff had threatened to do.
>
> On multiple different occasions, Dr. Pooja Joshi and I have expressed our concerns to UC officials. We have offered to provide information and documentation for the investigation. However, we have not received an appropriate response from UC. Instead, our access to UC and our belongings in the lab was suddenly and unexpectedly suspended, and we were advised to stop our work and stay away from the lab.
>
> We are seriously concerned by how UC is handling this situation. We are not going to let others take credit for our hard work. We are not going to let others damage our work and career. We are not going to stand by and watch toxic masculinity get rewarded.
>
> At this time, we have no choice but to take necessary and appropriate action to protect ourselves.
>
> Yours Truly,
>
> Shanea Estes and Pooja Joshi

54. On April 20, 2022, Plaintiff and Dr. Joshi followed up with Drs. Cushion and LeCras as follows:

> Dear Dr. Cushion and Dr. LeCras,
>
> I met with HR again on 4.14.22 to discuss the concerns I had emailed you about on 4.4.22. I explained to Ms. Christine Gilliam that suspending my research at UC since 3.15.22 is harming my career and facilitating the goals of Jeffrey Crocker to steal my work as his own accomplishments and these facts are supported by a large amount of documented evidence.
>
> I informed Ms. Gilliam that when Jeff was asked to do his own work, he threatened me and Dr. Pooja Joshi. Jeff boasted that he can shut down the lab whenever he wants by breaking critical shared equipment or making false complaints about animal use to bring our work to a stop and then all he would need to do to graduate would be to write up his thesis with one of his committee members or program director without doing any more work. Jeff clearly had a plan but he was being so violent/abusive at that time that I was more concerned about my safety than his other threats. I also did not think anyone would believe his lies and actually shut down the lab.
>
> Ms. Gilliam said she is simply collecting information and cannot comment on the investigation, suspension of my research, or inappropriate use of my data/work by Jeff Crocker. She said that before I take any action, I should try to reach out to you once again as you are the persons charged with overseeing these aspects at UC. I have forwarded my prior email below.
>
> Yours Truly,
> Shanea Estes

55. On May 5, 2022, Senior Associate Vice President for Research Jane E. Strasser, Ph.D., emailed Plaintiff as follows:

> Hello,
> I have been made aware that you have expressed the concern that Jeffrey Crocker took credit for your work. I am attempting to assess that allegation and would appreciate anything that you can provide to substantiate it. Once you have compiled that information it would likely be helpful to have a conversation. If you let me know how long you need to compile I can move forward with scheduling a time.
> Please let me know if you have questions or concerns.
> Thank you for your consideration.

56.     On May 19, 2022, Plaintiff supplied Dr. Strasser with the following detailed accounting of her complaints against Crocker:



**From:** Estes, Shanea (estess3) <estess3@ucmail.uc.edu>
**Sent:** Thursday, May 19, 2022 8:55 PM
**To:** Strasser, Jane (strassje) <strassje@ucmail.uc.edu>
**Cc:** Estes, Shanea (estess3) <estess3@ucmail.uc.edu>; Joshi, Pooja (joshipo) <joshipo@ucmail.uc.edu>
**Subject:** Concerns

Dr. Strasser,

We are concerned that Jeffrey Crocker reported our research results as being his own. A large portion of Jeff's report (attached NIH RPPR from 2/1/21-1/31/22) seems to be comprised of our work product. Jeff did not ask for our permission, acknowledge our contribution, or inform us that he had used our data/results from a common project as well as from our distinct primary projects (attached spreadsheet). This could not have been an honest mistake.

- Over the past year, our superisor Dr. DeMazumder asked everyone in lab to help Jeffrey Crocker meet a Dec 2022 graduation deadline. But he also told Jeff to take primary responsibility for his own project.
- Jeff did not follow these instructions. He slacked off and took advantage of our goodwill. The attached spreadsheet accounts for the animal studies for Pooja's (P) and Shanea's (S) projects in light yellow vs. the common project in bluish-grey. The actual work done by P/S is shown in bright yellow vs. the minimal work by Jeff in red. All cells in the rows for the common project should have been red but they are not because Jeff didn't do his assigned work. He did not even show up in lab for weeks at a time. To avoid wasting animals, we picked up his pieces and had to work longer hours. When this became too much, we let Dr. D know.
- In a group meeting in early March 2022, Dr. D instructed us to not pick up after Jeff when he doesn't do his assigned work. He told us to still try to help Jeff but without compromising our own work. Dr. D told Jeff to take ownership of his own project. Dr. D also asked everyone to send him a detailed account of all animal work, interventions, drugs, data, etc. Nageswar Kanuri was on thin ice for this. His data from heart failure (HF) animals were deemed unusable after inspections. So Nageswar had stopped working on HF animals and did studies on normal animals. But he didn't give any records to Dr. D and Dr. D warned Nageswar that his job would be terminated if he doesn't produce his records.
- During the meeting, Jeff agreed to do everything Dr. D asked. But afterwards, Jeff was very upset at us that we told Dr. D that he had not been working. Jeff directly threatened us and displayed acts of violence (see attached email).
- We overheard Jeff and Nageswar conspiring to shut down the lab such as breaking critical shared equipment or creating IACUC protocol violations. Jeff also made these threats to us directly. Jeff boasted that he had the power to stop our work any time he wants. Jeff said someone told him that all he has to do is tamper with the animal and drug records and then the PI would be held responsible and the entire lab would shut down.
- Jeff threatened us after lab meeting stating that Nageswar had lied about the FP expiring in Sep 2021, and all he has to do is tell 'them' and the lab is shut down. We did not know whether what he said was true because Nageswar was charged with maintaining the FP records. We were worried that Jeff was trying to frame us. So, we contacted the LAMS Director Joanne Tetensswoodring and self-reported to Joanne that the FP used by our lab from Aug-Sep 2021 may have expired in July 2021. After Sep 2021, we used a new bottle of unexpired FP and have all the proper documentation for this.
- Joanne said not to worry because we have now self-reported this. Joanne also knew that in mid-Aug 2021, Nageswar got in big trouble because LAMS kept finding various expired substances and materials in his work area for preceding 6 months. Dr. D was very upset because Nageswar gave different excuses. Dr. D said that if he finds anything else even close to expiring in the lab, Dr. D will stop Nageswar's work and put him in a remediation program with Joanne. We were present for these discussions and copied on some of these emails. So, we were shocked to hear that Nageswar lied about the FP expiration date in Sep 2021 right after he got in trouble for expired drugs in Aug 2021.
- Also in early March 2022, there was a scheduled IACUC inspection, so while cleaning up the lab, we found Jeff's NIH RPPR in the common lab space. After the lab was shut down, we took a closer look (attached). More than 80% of the data in his RPPR were data collected/analyzed by us. Not only did Jeff not do his own work or acknowledge our contribution in the common project, he also took data from our primary projects (attached spreadsheet) and reported them in his RPPR as being his own work. He even used photos Shanea had taken during in situ studies (she had texted them to Jeff to show how cool her experiments were going but not for him to use). He did not even ask her or give her credit. These are documented in lab records and in the attached RPPR. In fact, his RPPR actually states that he will use Pooja's working heart data in the future but he never asked or sought permission from Pooja.
- The worst part is that we never got a chance to let Dr. D know that it was our work that Jeff had been showing in his RPPR and probably in thesis committee meetings until after the lab had shut down.

Since early March 2022, we tried to inform university officials of Jeff's behavior, his attempts to frame us, and that he has been taking credit for our work. We feel that our concerns are largely ignored by UC officials and that we were punished for voicing our concerns. After we contacted HR, our ID access was abruptly terminated. Dr. Cushion instructed us to leave the university premises. Then HR told us they cannot help us and we should write to Dr. Cushion and we wrote to her but she did not respond. We feel all of this has been very unfair treatment.

Thank you for your attention and we look forward to meeting with you tomorrow.

Yours truly,

Pooja Joshi and Shanea Estes

57.     Throughout the summer of 2022, Plaintiff actively cooperated with the investigation she believed was being conducted into Crocker's behavior and supplied investigators with the information they requested.

58.     On June 22, 2022, Dr. Strasser demanded evidence of Crocker's misconduct, which Plaintiff provided on June 29, 2022.

59.     On July 12, 2022, Dr. Cushion cleared Crocker of wrongdoing.

60.     On August 1, 2022, UC abruptly locked Plaintiff out of its computer and information technology networks and terminated her email access without warning or explanation.

61.     In September 2022, Dr. Strasser falsely reported to VUMC Department of Medicine Chair W. Kimryn Rathmell, M.D., Ph.D., that Plaintiff had engaged in academic and research misconduct without supplying additional details.  Dr. Strasser did so while Plaintiff was cooperating with Dr. Strasser's "investigation," without informing Plaintiff of the same and without notifying Plaintiff of her due process rights.

62.     On or about October 14, 2024, Dr. Rathmell informed Plaintiff of Dr. Strasser's allegations and suspended her from access to VUMC's facilities pending the outcome of Dr. Strasser's investigation at UC.  Neither Dr. Rathmell nor anyone employed by UC supplied Plaintiff with any information beyond that.

63.     In December 2022, UC dissolved Crocker's dissertation panel and installed a new panel to get him over the goal line.  That month, UC awarded Crocker a Ph.D. in physiology and systems biology.

64.     Since December 2022, Crocker has been employed by the University of Cincinnati College of Medicine.

65.     In February 2023, VUMC found no substance whatsoever to any of UC's allegations against Plaintiff.

66. Shortly thereafter, UC ultimately cleared Plaintiff of the allegations of misconduct, the particulars of which it never informed her and against which she was never permitted to defend.

67. By that time, however, it was too late. The entire affair destroyed Plaintiff's reputation, career, and professional prospects, and she can never earn a livening in her chosen field.

68. To this day, Crocker is fraudulently passing off Plaintiff's work as his own on UC's website with UC's knowledge and blessing. Crocker's dissertation also contains intellectual property owned by other entities and institutions.

69. In November 2023, Plaintiff filed her Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC") against UC alleging violations of Title VII in Charge No. DAY76(000505)07212023.

70. On June 6, 2024, the OCRC issued Plaintiff a Right to Sue Letter.

## CAUSES OF ACTION

### Count I
### Violation of Title IX, 20 U.S.C. §1681, *et seq.*,
### by UC and UC Medical Center:
### Sexual Harassment and Hostile Work Environment

71. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

72. Under Title IX, "[n]o person in the United States shall, based on sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

73.     At all times relevant to this Complaint, Plaintiff has been a "person" protected under Title IX.

74.     At all times relevant to this Complaint, Plaintiff participated in "activities" and/or "programs" that were part of UC's regular operations.

75.     Sexual harassment under Title IX is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

76.     Title IX requires UC to promptly investigate all allegations of sexual harassment, including sexual assault and abuse by fellow students.

77.     As described in this Complaint, Plaintiff suffered sex-based harassment, assault, and abuse from Crocker.

78.     At all times relevant to this Complaint, Crocker was a student and employee at UC who shared a workplace with Plaintiff.

79.     As alleged in this Complaint, Plaintiff suffered sexual harassment so severe, pervasive, and objectively offensive at the hands of Mr. Crocker that it deprived her of access to the educational opportunities and benefits provided by UC.

80.     As described in this Complaint, UC had actual knowledge of specific instances of the sexual harassment Plaintiff alleges in this Complaint because she reported them to UC's Human Resources, Title IX personnel, and other officials in a position to correct the wrongs she alleges in this Complaint.

81.     At all times relevant to this Complaint, UC and its officials failed to stop Crocker's conduct despite their ability to exercise complete control over the situation.

82. UC's failure to investigate credible allegations against Crocker allowed Crocker to continue his harassment, abuse, and assault of Plaintiff, such that UC was at best deliberately indifferent.

83. UC's failure to investigate credible allegations against Crocker also allowed Crocker to receive a Ph.D. from UC and remain a UC employee in his chosen field to this day, such that UC was deliberately indifferent.

84. As alleged in this Complaint, UC was at best deliberately indifferent to the harassment Plaintiff alleges in this Complaint by, without limitation:

     a. Mishandling Plaintiff's reports and complaints about Mr. Crocker's conduct;

     b. Ignoring Plaintiff's reports and complaints about Mr. Crocker's conduct;

     c. Retaliating against, rebuking, and punishing Plaintiff for reporting, complaining about, and objecting to Mr. Crocker's conduct;

     d. Failing to promptly and appropriately investigate, remedy, and respond to Plaintiff's reports and complaints about Mr. Crocker's conduct;

     e. Shielding and protecting Mr. Crocker from the consequences of the conduct Plaintiff complained of;

     f. Awarding Crocker with a Ph.D. with Plaintiff's research that he held out as his own;

     g. Awarding Mr. Crocker with employment;

     h. Failing to adequately supervise Crocker;

      i.   Failing to take prompt and appropriate corrective action to prevent Mr. Crocker from sexually harassing other students and employees; and

      j.   Failing to train its employees to prevent, investigate, or report the sexual abuse of students and employees.

85.    UC's deliberate indifference caused Plaintiff to undergo harassment, abuse, and assault because of her sex and made her vulnerable to it.

86.    UC's creation of and deliberate indifference to the sexually hostile culture substantially increased the risk that Plaintiff and others would be sexually harassed and abused.

87.    As a direct result of UC's deliberate indifference to Plaintiff's credible allegations against Crocker, its failure to investigate those allegations, and its failure to correct the same, Plaintiff's professional and academic reputation are destroyed, and she is unable to work in her chosen field, despite her qualifications.

88.    As a direct result of UC's creation of and deliberate indifference to a sexually hostile educational environment in violation of Title IX, Plaintiff has suffered and continues to suffer damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

**Count II**
**Violation of Title IX, 20 U.S.C. §1681, *et seq.*,**
**by UC and UC Medical Center:**
**Discrimination Based on Sex**

89.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

90. By virtue of being a woman, Plaintiff is a member of a protected class under Title IX.

91. At all times relevant to this Complaint, Plaintiff was qualified for her position, work, status, research, privileges, rights, and access to UC's facilities, over which UC exercised complete control.

92. As alleged in this Complaint, and without limitation, by locking Plaintiff out of its research facilities, destroying her research, test subjects, experiments, and other scholarship alleged in this Complaint, and by falsely accusing her of wrongdoing to VUMC and others, resulting in the destruction of her career, UC deliberately caused Plaintiff to suffer adverse actions within the meaning of Title IX by excluding her from participation in UC's education program because of her sex.

93. At all times alleged in this Complaint, Crocker and similarly situated men were treated more favorably than Plaintiff because of her protected status. For instance, as alleged in this Complaint, while Plaintiff was punished, harassed, abused, assaulted, retaliated against, defamed, and the like by Crocker, UC, and its officials, Crocker was treated favorably in the manner described in this Complaint despite his comparative lack of experience, skill, and effort.

94. At all times relevant to this Complaint, Drs. DeMazumder, Worrell, Byrd, Cushion, LeCras, Strasser, UC Human Resources personnel, UC's Title IX personnel, and others had the authority to address discrimination alleged by Plaintiff and institute corrective measures on her behalf to ensure that she wasn't deprived of the benefits of UC's academic programs, services, facilities, etc.

95.     Instead, UC officials decided not to remedy the violations alleged in this Complaint.

96.     As a direct result of UC's discrimination against Plaintiff based on her sex in violation of Title IX, she suffered and continues to suffer damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

<u>**Count III**</u>
**Violation of Title IX, 20 U.S.C. §1681, *et seq.*,**
**by UC and UC Medical Center:**
**Retaliation**

97.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

98.     Without limitation, and as alleged in this Complaint, by (a) pursuing complaints against Crocker and others for mistreatment, abuse, harassment, and assault based on her sex; (b) objecting to the misconduct of Crocker and others because of her sex; (c) trying to enforce her rights under Title IX, Title VII, and applicable law; and (d) objecting to the deprivation of her rights and benefits associated with UC's programs, facilities, and activities, Plaintiff engaged in protected activity under Title IX.

99.     At all times relevant to this Complaint, UC knew that Plaintiff engaged in protected activity because she addressed her concerns, objections, and complaints to HR, the Title IX Office, and other officials.

100.    As alleged in this Complaint, by locking Plaintiff out of its research facilities, destroying her research, test subjects, experiments, and other scholarship alleged in this Complaint, and by falsely accusing her of wrongdoing to VUMC and others, resulting in the destruction of her career, UC deliberately caused Plaintiff to suffer adverse actions within the meaning of Title IX.

101.    More specifically, UC retaliated against Plaintiff by expelling her from UC, terminating her access to UC's facilities, including both the "wet" lab and "dry" computing facilities where she'd conducted her federally funded research, killing her research animals purchased with federal funds, disassembling her federally funded experimental setup, and destroying all of her other federally funded research.

102.    Instead of taking Plaintiff's reports of wrongdoing against Crocker seriously, UC disregarded them and escalated its retaliation by falsifying allegations against Plaintiff to the VUMC Chair of Medicine, Dr. Kimryn Rathmell. For example, Dr. Strasser falsely reported that Plaintiff and Dr. Joshi had been doing research at UC without the necessary authorization and permissions.

103.    UC's conduct alleged in this Complaint constitutes retaliation in violation of Title IX.

104.    As a direct result of UC's retaliation against Plaintiff in violation of Title IX, she has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

## Count IV
### Violation of Title VII, 42 U.S.C. §2000e, *et seq.*,
### by UC and UC Medical Center:
### Discrimination Based on Sex

105.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

106.    At all times relevant to this Complaint, UC was an "employer" with fifteen or more employees on each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of Title VII.

107.    At all times relevant to this Complaint, Plaintiff was an "employee," defined as "an individual employed by an employer" by 42 U.S.C. §2000e(f).  For instance, at all times relevant to this Complaint: (a) UC had the exclusive right, ability, and means to control Plaintiff's access to its academic and research facilities, computer networks, resources, officials, leadership, human resources offices, and Title IX offices, and all other resources made possible by federal grants administered by UC; (b) UC had the exclusive right, ability, and means to control the manner by which Plaintiff conducted her federally funded research; (c) UC assigned professionals to supervise Plaintiff's work and to provide her with instruction directly related to the same; (d) UC supplied the instrumentalities, facilities, and tools directly associated with Plaintiff's work; (e) UC and Plaintiff had an exclusive arrangement for Plaintiff to engage in her work, and Plaintiff was not free to take her work to another institution; (f) UC supplied Plaintiff with workplace training and orientations; (g) Plaintiff worked alongside UC employees, instructors, officials, and students on similar research and in the same facilities at all times relevant to this Complaint; (h) UC supplied Plaintiff with a "uc.edu" email address;

and (i) UC supplied Plaintiff with a "Bearcat Badge" to access its facilities; and (j) the work performed by Plaintiff at UC benefitted the institution and was part of its regular business operations.

108. At all times relevant to this Complaint, UC had the exclusive authority to terminate Plaintiff's relationship with the institution, as exemplified by the fact that it did so.

109. The economic reality of Plaintiff's position and work with UC was such that UC had the power over her to directly and adversely impact her ability to earn a living in her chosen field.

110. As exemplified by UC's promotion and hiring of Crocker upon awarding him a Ph.D. in December 2022, there was a direct connection between her status as a volunteer and access to specific job opportunities at UC such that a clear pathway to employment was theoretically possible for her, too. Particularly because she was more skilled and qualified than Crocker for employment at that level.

111. At all times relevant to this Complaint, Plaintiff was a member of a protected class under Title VII by virtue of being a woman.

112. At all times relevant to this Complaint, Plaintiff was qualified for her position at UC.

113. As alleged in this Complaint, UC discriminated against Plaintiff because she is a woman.

114. As described in this Complaint, UC took materially adverse actions against Plaintiff.

115.    As described in this Complaint, UC treated similarly situated men, including, without limitation, Crocker, more favorably than it did Plaintiff.

116.    As a direct and proximate result of UC's discrimination against Plaintiff based on her sex and gender in violation of Title VII, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### Count V
### Violation of Title VII, 42 U.S.C. §2000e, *et seq.*,
### by UC and UC Medical Center:
### Retaliation

117.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

118.    As alleged above, at all times relevant to this Complaint, Plaintiff engaged in activity protected by Title VII and Title XI.

119.    As alleged above, at all times relevant to this Complaint, UC knew that Plaintiff engaged in activity protected by Title VII and Title IX.

120.    As alleged above, UC retaliated against Plaintiff by taking materially adverse actions against her because she engaged in activity protected under Title VII and Title IX.

121.    As a direct and proximate result of UC's retaliation against Plaintiff in violation of Title VII and Title IX, Plaintiff has suffered damages in excess of the jurisdictional threshold of this Court to be determined by the trier of fact.

### Count VI
### Violation of the Fourteenth Amendment, 42 U.S.C. §1983,
### by Dr. Strasser and the Doe Defendants:
### Denial of Due Process

122.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully rewritten.

123. The Fourteenth Amendment forbids the State to deprive any person of life, liberty, or property without due process of law.

124. Under the Fourteenth Amendment, where a person's good name, reputation, honor, or integrity is at stake because of government action against her, the minimal requirements of due process must be satisfied before any governmental deprivation of a person's property.

125. Thus, at all times relevant to this Complaint, Plaintiff had the right to minimal due process, *i.e.*, notice and an opportunity to be heard.

126. Whether as a student, a visitor, a volunteer, a contractor, or an employee, Plaintiff's continued access to UC's academic and research facilities and programs implicates a clear constitutional property interest in her then and future employment.

127. Section 1983 imposes civil liability on a person acting under color of state law who deprives another of the "rights, privileges, or immunities secured by the Constitution and laws."

128. At all times relevant to this Complaint, Dr. Strasser and upon information and belief, the Doe Defendants were public employees and officials at UC acting under color of State law.

129. As alleged in this Complaint, UC officials like Dr. Strasser and the Doe Defendants suspended Plaintiff from accessing UC's facilities and resources, her research, and other benefits of attending UC as a visiting academic, contractor, volunteer, and researcher.

130. Dr. Strasser and the Doe Defendants suspended Plaintiff in the manner described in this Complaint based on alleged academic misconduct.

131. Among academics at Plaintiff's level of experience, background, knowledge, and skill, her reputation among her peers is the lifeblood of her ability to earn a living in her chosen field.

132. A scholar's good reputation allows them to earn funding for their research in a particular area under highly competitive circumstances, perform that research at prestigious institutions like UC under the supervision of, and with, other respected scholars, and publish their findings in academic journals.

133. Among academics like the Plaintiff, publication generates opportunities for wider recognition, to speak at prestigious academic and professional conferences, and to market their skills and earn a living.

134. If sustained, allegations of academic misconduct can irreparably destroy an academic's scholarly and professional standing among their peers and her opportunities to advance professionally. Indeed, as alleged in this Complaint, even the suspicion of such misconduct has had and will continue to have an irreparable and materially adverse impact on Plaintiff's ability to earn a living in her chosen field.

135. Dr. Strasser and the Doe Defendants, however, failed to notify Plaintiff of what the allegations of wrongdoing against her entailed upon suspending her and communicating allegations of misconduct to Dr. Rathmell and others at VUMC.

136. Dr. Strasser and the Doe Defendants also failed to allow Plaintiff to defend herself from allegations of wrongdoing, thus bringing the full force of the State against her without minimal due process.

137. In particular, at all times relevant to this Complaint, Dr. Strasser and the Doe Defendants acted under color of State law when they allegedly investigated Plaintiff for academic misconduct, barred Plaintiff from UC's facilities, destroyed her research, communicated acts of alleged wrongdoing to Dr. Rathmell and others at VUMC, and destroyed her ability to earn a living in her chosen field, without (a) informing Plaintiff of the nature of the allegations against her and (b) allowing her to defend herself from the same. Indeed, to this day, no one at UC has informed Plaintiff of what acts and omissions attributable to her motivated Dr. Strasser and the Doe Defendants to take such materially adverse actions against her.

138. Dr. Strasser and the Doe Defendants therefore failed to afford Plaintiff adequate procedural rights before depriving her of her protected property interest in violation of the Fourteenth Amendment, and rights enforceable under Section 1983.

139. The actions of Dr. Strasser and the Doe Defendants deprived Plaintiff of the constitutional right to be free of arbitrary suspension and adverse action without minimal due process.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Shanea K. Estes prays for judgment against Defendants the University of Cincinnati and University of Cincinnati Medical Center, LLC, as follows: (a) compensatory damages; (b) back pay; (c) front pay; (d) loss of wages; (e) other equitable relief; (f) damages for emotional distress and psychological injuries; (g) statutory damages; (h) punitive damages; (i) reimbursement of her attorney's fees and costs; and (j) all other relief to which she's entitled.

Respectfully submitted,

*/s/ Justin Whittaker*
Justin Whittaker, Esq. (0093212)
WHITTAKER LAW, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
Tel: (513) 457-5545
Fax: (513) 436-0698
Justin@WhittakerLawFirm.com

**Counsel for Plaintiff Shanea K. Estes**

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Justin Whittaker*
Justin Whittaker, Esq. (0093212)
WHITTAKER LAW, LLC
2055 Reading Road, Suite 260
Cincinnati, Ohio 45202
Tel: (513) 457-5545
Fax: (513) 436-0698
Justin@WhittakerLawFirm.com

**Counsel for Plaintiff Shanea K. Estes**