**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SHANEA K. ESTES, | : | |
| *Plaintiff,* | : | Case No. 1:24-cv-00465-JPH |
| | : | |
| v. | : | Judge Jeffery P. Hopkins |
| | : | |
| UNIVERSITY OF CINCINNATI, *et al.,* | : | |
| | : | |
| *Defendants.* | : | |

---

## OPINION & ORDER

---

Sometimes, all that stands in the way of opportunity is timeliness. In this case, Plaintiff Shanea Estes ("Plaintiff" or "Estes") pleads a wide array of claims arising under Title IX, Title VII, and Section 1983 stemming from when she was a volunteer researcher and visiting scientist at the University of Cincinnati ("UC"). These claims, which include sexual harassment, a hostile work environment, sexual discrimination, retaliation, and violations of procedural due process, began in February 2022 and culminated in February 2023. But Plaintiff did not initiate this lawsuit until August 2024. The applicable statute of limitations bars many—although not all—of Plaintiff's claims. As much as Plaintiff has alleged colorable claims and cognizable injuries, the main obstacle here to certain of her claims advancing beyond the pleading stage is that she alleged them too late.

This matter is before the Court on Defendant Jane Strasser's ("Strasser") Motion to Dismiss (Doc. 9) and Defendant University of Cincinnati's Motion to Dismiss (Doc. 10). For the reasons set forth below, the Court **GRANTS** Defendant Strasser's Motion to Dismiss (Doc. 9) and **DISMISSES** Count VI **WITH PREJUDICE**. The Court **GRANTS IN PART,**

**DENIES IN PART** Defendant UC's Motion to Dismiss (Doc. 10) and **DISMISSES** Counts I, II, and IV **WITH PREJUDICE**. Counts III and V remain viable claims against UC.

## I.     FACTUAL ALLEGATIONS

Plaintiff Shanea Estes is a well-credentialed science researcher. She earned her bachelor's degrees in biology and animal science from North Carolina State University in 2012. Am. Compl., ¶ 13. Over the next nine years, Estes was engaged as a research assistant in various universities and research programs. *Id.* ¶¶ 14, 16. During this time, she also earned her master's degree in laboratory investigation from Vanderbilt University. *Id.* ¶ 15.

On or about March 31, 2021, the University of Cincinnati recruited Plaintiff as a volunteer affiliate, contractor, and visiting scientist in its Department of Internal Medicine, Division of Cardiovascular Health and Diseases at the University of Cincinnati College of Medicine, under the supervision of Dr. Deeptankar DeMazumder. *Id.* ¶ 17. Estes' salary was paid by the United States Department of Defense and other grants to her home institution, Vanderbilt University Medical Center ("VUMC"). *Id.* Some of the federal grant funds were provided by VUMC to UC as "sub-award contracts" to support Plaintiff's work at UC, including conducting experiments and paying for her access to lab space, equipment, animals, and mentorship under various medical departments at UC. *Id.* ¶ 18.

Plaintiff's volunteer research position at UC was originally effective from March 29, 2021, through March 31, 2022, though UC later extended it through May 2023. *Id.* ¶ 20. Upon recruiting Plaintiff, UC established the terms of the relationship as follows:

> All rights to and interests in discoveries, inventions, or patents which result from research or investigation conducted within the scope of your volunteer appointment; or in any university facility; or with funding, equipment or infrastructure provided by the university, shall be the sole property of the university. By accepting this appointment, you agree to be bound by university policies on copyrights and patents….

*Id.* ¶ 21. Plaintiff was also supplied the following benefits and access once she began her volunteer position: (a) orientation and training related to its facilities and computer networks which were scheduled and led by its employees; (b) a "uc.edu" email address; (c) supervision by its employees; (d) instruction by its employees; (e) access to its facilities through a "Bearcat Badge"; and (f) access to her research, which UC controlled but was funded by the federal government. *Id.* ¶ 24.

One of Estes' laboratory colleagues, and the person at the nexus of virtually all of Plaintiff's present claims, was UC Ph.D. student Jeffery S. Crocker ("Crocker"). *Id.* ¶ 27. Between 2017 and December 2022, UC employed Crocker to conduct federally funded research in the same facilities used by Plaintiff. *Id.* In January 2021, Crocker became the subject of an investigation concerning the falsification of research data and plagiarism. *Id.* ¶ 28. After being excused from his research and attendance obligations, Crocker returned to the laboratory in the fall of 2021. *Id.* ¶ 33.

Plaintiff alleges that, upon Crocker's return, he became envious of Plaintiff's hard work and success in her area of research. *Id.* ¶ 35. According to Plaintiff, Crocker habitually referred to Plaintiff and other female colleagues and senior faculty in derogatory terms, like "bitches," and "treat[ed] her as inferior because she is a woman." *Id.* ¶¶ 35, 37. By contrast, Plaintiff contends that Crocker never appeared to refer to male coworkers in similarly derogatory terms, nor did he treat male coworkers as subordinates or as his inferiors. *Id.* ¶ 38.

In February 2022, Plaintiff avers that she and other colleagues discovered Crocker again falsifying research data and incorporating Plaintiff's research as his own when drafting reports to his Ph.D. dissertation committee and to the National Institutes of Health. *Id.* ¶ 39. When Plaintiff objected, Crocker allegedly retaliated by accusing her of research misconduct

and by threatening to shut down the lab to prevent her from conducting research. *Id.* Plaintiff became fearful that this would impact her career and future employment prospects. *Id.* Plaintiff further claimed that Crocker began to stalk and menace her around campus, and Crocker allegedly assaulted her in a UC facility upon learning that she reported his misconduct to his Ph.D. co-advisors. *Id.* ¶ 40.

Plaintiff avers that when she reported Crocker's misconduct to Ph.D. Program Director Dr. Roger Worrell and Chair of Internal Medicine John Byrd, MD, both individuals "ignored Plaintiff's objections and complaints[,] … did no meaningful investigation[,] and took no corrective action." *Id.* ¶ 42. Frustrated by the inaction, Plaintiff and another female colleague, Pooja Joshi, reported Crocker's conduct as targeted harassment, discrimination, and retaliation based on sex and gender to UC's Central Human Resources ("HR") office, UC's Title IX Coordinator in its Office of Equal Opportunity, UC's Director of Laboratory Animal Medical Services, and other faculty, officials, and administrators at UC. *Id.* ¶ 43. According to Plaintiff, UC's HR and Title IX offices conducted "no meaningful investigation into Plaintiff's complaints." *Id.* ¶ 45. Instead, Plaintiff claims that the offices "advised Plaintiff to abandon her research and leave UC to avoid being physically harmed by Crocker." *Id.*

Somewhere around March 15, 2022, Plaintiff claims that UC "suspended" Plaintiff's facilities access pending investigation into certain issues that were recently discovered. *Id.* ¶ 46. UC simultaneously suspended the badge access of all "collaborators" who "[were] not students, faculty, or staff of the University of Cincinnati." *Id.* Over the next several months, Plaintiff corresponded multiple times with various UC officials, cooperating with the unfolding investigation, and requesting updates as to when she could resume work at the research laboratory. *Id.* ¶¶ 48–52. On August 1, 2022, UC "abruptly" locked Plaintiff out of

its computer and information technology networks and terminated her UC email access. *Id.* ¶ 55.

According to Plaintiff, approximately one month later, in September 2022, UC employee Dr. Jane E. Strasser, Ph.D. "falsely and voluntarily reported to VUMC Department of Medicine Chair W. Kimryn Rathmell, M.D., Ph.D., that Plaintiff had engaged in academic and research misconduct" and launched an investigation into Plaintiff regarding the same. *Id.* ¶ 56. Plaintiff further alleges that this was done without "notifying Plaintiff of her due process rights, and without a hearing or the suggestion of a hearing." *Id.* On or about October 14, 2022, Dr. Rathmell of VUMC informed Plaintiff of Dr. Strasser's allegations and suspended her from access to VUMC's facilities pending the outcome of Dr. Strasser's investigation. *Id.* ¶ 57.

Subsequently, in February 2023, UC cleared Plaintiff of all allegations of academic misconduct. *Id.* ¶ 60. Nine months later, in November 2023, Plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC") against UC for alleged violations of Title VII. *Id.* ¶ 62. And on June 6, 2024, the OCRC issued Plaintiff a Right to Sue Letter. *Id.* ¶ 63. Thereafter, on August 29, 2024, Plaintiff brought the instant suit and later filed an Amended Complaint on November 25, 2024. Doc. 6.

## II.  LEGAL STANDARD

Defendants move to dismiss Plaintiff's Amended Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). *See* Docs. 9, 10.

### A.  Subject-matter jurisdiction under Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a claim may be dismissed for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1)

motion that attacks jurisdiction based upon the face of the pleading requires that the court accept the non-moving party's allegation of facts as true. *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). A Rule 12(b)(1) motion that challenges the factual basis of the court's jurisdiction requires the party asserting jurisdiction bears the burden of establishing it. *Id.*

### B. Personal jurisdiction under Rule 12(b)(2)

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move for dismissal for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). When a court decides a motion under Rule 12(b)(2): The plaintiff must first make a prima facie case, which can be done merely through the complaint. The burden then shifts to the defendant, whose motion to dismiss must be properly supported with evidence. Once the defendant has met the burden, it returns to the plaintiff, who may no longer "stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 504 (6th Cir. 2020) (citations omitted). "The party seeking to establish the existence of personal jurisdiction bears the burden to establish such jurisdiction, over each defendant independently." *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014) (citations and internal quotations omitted).

### C. Failure to state a claim under Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not contain "detailed factual allegations" but must provide "more than an unadorned, the–defendant–unlawfully–harmed–me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the

elements of a cause of action will not do." *Id*. (citing *Twombly*, 550 U.S. at 555). Courts need not accept as true naked assertions devoid of factual enhancement. *Id*. (citing *Twombly*, 550 U.S. at 557). "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

### III. LAW AND ANALYSIS

#### A. Counts I–III against UC. Violation of Title IX, 20 U.S.C. § 1681, *et seq*.: Sexual Harassment and Hostile Work Environment; Discrimination Based on Sex; Retaliation.

##### i. *Are Plaintiff's Title IX gender discrimination claims preempted by her Title VII gender discrimination claims?*

As a preliminary matter, the Court first addresses a preemption argument raised by UC. UC argues that "to the extent Plaintiff claims to be an employee, her Title IX claims fail as a matter of law[] as they are preempted by Title VII…." Doc. 10, PageID 107. UC cites to several decisions from outside of the Sixth Circuit for this proposition. *See, e.g., Joseph v. Bd. of Regents of the Univ. Sys. of Georgia*, 121 F.4th 855 (11th Cir. 2024); *Lakoski v. James*, 66 F.3d 751, 758 (5th Cir. 1995); *Waid v. Merrill Area Pub. Sch.*, 91 F.3d 857, 862 (7th Cir. 1996), *rev'd in part on other grounds, Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009).

Admittedly, there is circuit split as to this question, and the Sixth Circuit has not definitively weighed in on this matter with a decision binding on this Court. While the Fifth, Seventh, and Eleventh Circuits maintain a Title VII preemption doctrine, the First, Third, Fourth, and Eighth Circuits allow claims to proceed under both Title VII and Title IX. *Erikson v. Xavier Univ.*, No. 1:23-cv-66, 2024 WL 1156313, at *5 (S.D. Ohio Mar. 18, 2024) (citing *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896–97 (1st Cir. 1988); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 563–64 (3d Cir. 2017); *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994); *Brim v. Univ. of Iowa*, 90 F.3d 271, 275–76 (8th Cir. 1996)).

The Sixth Circuit's most direct answer to the preemption question was articulated in *Ivan v. Kent State Univ.*, where the panel "overrule[d]" the district court's holding "that Title VII preempts an individual's private remedy under Title IX." 92 F.3d 1185, at *2 n.10 (6th Cir. 1996). Nonetheless, the precedential value of this decision is highly suspect, and the law on this question "'remains unsettled'" because the panel "placed this language within a footnote of an unpublished opinion." *Erikson*, 2024 WL 1156313, at *5 (quoting *Wiler v. Kent State Univ.*, No. 5:20-cv-490, 2021 WL 809350, at *7 (N.D. Ohio Mar. 3, 2021)); *see also Goldblum v. Univ. of Cincinnati*, No. 1:19-cv-398, 2019 WL 5307247, at *6 (S.D. Ohio Oct. 21, 2019), *report and recommendation adopted*, 415 F. Supp. 3d 799 (S.D. Ohio 2019)). Still, courts in the Sixth Circuit appear to remain bound to *Ivan*'s answer that a Title IX claim is not preempted by a Title VII claim, even though this declaration is relegated to a footnote. *See Wiler*, 2021 WL 809350, at *7 ("Notwithstanding questions of *Ivan*'s precedential value, other courts have followed *Ivan* as expressing the view of the Sixth Circuit."). As UC "has failed to cite any applicable authority to support its argument that Plaintiff's Title IX claims are preempted by her Title VII claims," the Court does not find its argument in favor of preemption persuasive and will adopt the holding in *Ivan*. *Mesbah v. Univ. of Louisville*, No. 3:22-cv-567-CHB, 2023 WL 6050232, at *16 (W.D. Ky. Sept. 15, 2023).

ii.    *Are Plaintiff's Title IX claims time-barred?*

Turning then to Plaintiff's claims under Title IX. UC argues that Plaintiff's Title IX claims are time-barred by the applicable two-year statute of limitations. UC asserts that "Plaintiff has not alleged a single action by UC against her that occurred within two years of August 29, 2024," the date when Plaintiff initiated the instant lawsuit. Doc. 10, PageID 106.

Plaintiff counters that she "had no reason to know of any injury at UC's hands until February 1, 2023." Doc. 11, PageID 114.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). An implied private right of action exists within Title IX. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979). Given that a plaintiff's right to bring an action is implied, "it should come as no surprise" that Title IX does not include an express statute of limitations. *Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1013 (6th Cir. 2022). Instead, Title IX "adopts the forum state's statute of limitations for personal-injury actions." *Id.* (citing *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996)); *see also Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 698 (6th Cir. 2022) (explaining that Title IX "borrows from Ohio's two-year statute of limitations for personal injury claims"). Ohio law contains a two-year limitations period for general personal injury claims. *See* Ohio Rev. Code § 2305.10(A). Although Ohio state law determines the limitations period, "federal standards govern when the statute begins to run." *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003) (citing *Wilson v. Garcia*, 471 U.S. 261, 267 (1985)

"The general federal rule is that 'the statute of limitations begins to run when the reasonable person knows, or in the exercise of due diligence should have known, both [her] injury and the cause of that injury.'" *Bishop v. Child.'s Ctr. for Developmental Enrichment*, 618 F.3d 533, 536 (6th Cir. 2010) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001)). The concept upon which this legal principle rests is called the "discovery rule," and the Sixth Circuit recently affirmed its application for use in cases that arise in the

Title IX context. *See Snyder-Hill*, 48 F.4th at 698. Unlike the "occurrence rule," which holds that a claim accrues at the moment that an injury occurs, the clock on Title IX claims governed by the "discovery rule" starts to run "only when a plaintiff knows or should have known certain facts related to their injury … that is the basis of the action" *Id*. at 698, 702.

In deciding when a plaintiff discovers or should have discovered the injury that is the basis of the cause of action, "courts look 'to what event should have alerted the typical lay person to protect his or her rights.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000)). An individual "cannot be alerted to protect [her] rights without knowledge about causation." *Snyder-Hill*, 48 F.4th at 702. In the Title IX context, this means that a student, faculty, or staff member "must know that their school exposed them to a heightened risk of harassment [*i.e.*, caused their injury] before they have a viable claim." *Id*.

But simply because a plaintiff was *harmed* does not mean that a defendant necessarily *injured* her. The requirement that a plaintiff discover "the injury which is the basis of [her] action," *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000), informs this Court's crucial observation: Plaintiff's Title IX claims are "against the school based on the school's actions or inactions, not the actions of the person who abused the [P]laintiff." *Snyder-Hill*, 48 F.4th at 702 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999)). In other words, Estes could not have been "alerted ... to protect … her rights" arising under a Title IX suit unless she had reason to believe that UC as an institution did something (or failed to do something) that caused her injury. *Johnson*, 777 F.3d at 843. Thus, UC's conduct—not Crocker's—is the "the act providing the basis of" Plaintiff's legally cognizable Title IX injury. *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 867 n.8 (6th Cir. 2020).

a. Count I: Sexual Harassment and Hostile Work Environment

Plaintiff's claim under Count I accrued when she knew or had reason to know that UC administrators "with authority to take corrective action" learned of Crocker's conduct, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), and were "deliberately indifferent to sexual harassment … that [was] so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] [Plaintiff] of access to the educational opportunities or benefits [UC] provided." *Davis*, 526 U.S. at 650. By design, the *Davis* Court's formulation of the elements of a Title IX private cause of action against a school for its response to student-on-student sexual harassment is a "high standard" that applies only "in certain limited circumstances." *Davis*, 526 U.S. at 643.

Plaintiff asserts that her "claims against UC arising under Title IX accrued no earlier than February 2023." Doc. 11, PageID 114. Her pleadings, however, clearly demonstrate to the contrary. Based on the allegations in the Amended Complaint, it appears that Crocker's alleged misconduct and sexual harassment began as early as the fall of 2021. Am. Compl., ¶ 33. Then in February of 2022, Plaintiff made a direct report to Drs. Worrell and Byrd that Crocker had "stalked, menaced, and assaulted" her. *Id.* ¶ 40. And by March of 2022, UC had "advised Plaintiff to abandon her research and leave UC to avoid being physically harmed by Crocker" and "suspended" Plaintiff's access to its facilities. *Id.* ¶¶ 45, 46. Although UC similarly suspended access to all those who "[were] not faculty, staff, of the University of Cincinnati," Plaintiff alleges that UC suspended *her* access to its facilities because of the "investigation of issues that [were] recently … discovered," and "ostensibly to shield her from contact with Crocker." *Id.* ¶¶ 46, 47. Throughout the summer of 2022, Plaintiff "actively cooperated with the investigation she believed was being conducted into Crocker's behavior."

11

*Id.* ¶ 52. But then on July 12, 2022, Crocker was "cleared" of wrongdoing, and UC "abruptly locked Plaintiff out of its computer and information technology networks and terminated her email access without warning" approximately three weeks later on August 1, 2022. *Id.* ¶¶ 54, 55.

Despite this sequence of events, Plaintiff urges this Court to accept the notion that she "had no reason to know of any injury at UC's hands" just yet. Doc. 11, PageID 114. According to Plaintiff, she "didn't have 'a complete and present cause of action' … until February 2023." *Id.* (quoting *Reguli v. Russ*, 109 F.4th 874, 879 (6th Cir. 2024)). Plaintiff makes this claim in part because, during the period between September 2022 and February 2023, Plaintiff was subjected to what she characterized as a "sham investigation" in which Dr. Strasser allegedly "falsely and voluntarily reported to VUMC … that [she] had engaged in academic and research misconduct." Am. Compl., ¶¶ 56, 127. Thus, according to Plaintiff, any "wrongdoing" by UC against her did not materialize until February 2023, when she had "been cleared … of UC's sham investigation [which] resulted in the ruination of [her] reputation and career." Doc. 11, PageID 114.

That argument is unconvincing. Plaintiff has not demonstrated a nexus as to how UC's so-called "sham investigation" against her constituted "deliberate[] indifferen[ce] to sexual harassment, of which [it had] actual knowledge, that [was] so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] [Plaintiff] of access to the … benefits provided by the school." *Davis*, 526 U.S. at 650. To be sure, Plaintiff, at one point, clearly had colorable claims of UC's deliberate indifference to the sexual harassment and hostile work environment between the fall of 2021 and summer of 2022. But because Plaintiff did not initiate the instant lawsuit until August 29, 2024, more than two years after first having

known or having had reason to know of the facts relating to her injuries, Count I is now time-barred by the applicable statute of limitations. *Id.*

Consistent with this Court's finding that any additional amendment to the Amended Complaint would be futile, Count I is **DISMISSED WITH PREJUDICE**.

### b. Count II: Discrimination Based on Sex

Plaintiff also alleges that UC discriminated against her based on sex "[b]y locking [her] out of its research facilities [and by] destroying her research, test subjects, experiments, and other scholarship." Am. Compl., ¶ 82. Plaintiff maintains that, at all times during the events in question, "Crocker and similarly situated men were treated more favorably than Plaintiff because of her protected status." *Id.* ¶ 83. However, these alleged injuries, like those alleged under Count I, all occurred before August 29, 2022, and such facts would independently give rise to a claim for discrimination based on sex under Title IX. *Snyder-Hill*, 48 F.4th at 705. Thus, these claims are barred from the Court's consideration by the two-year statute of limitations applicable to claims brought under Title IX.

To the extent that Plaintiff contends that certain of her injuries occurred after August 29, 2022, the Court will consider those injuries as part of its analysis of Count II of Plaintiff's sole remaining and timely filed allegation that UC discriminated against her "by defaming and falsely accusing her of wrongdoing to VUMC," (Am. Compl., ¶¶ 82–83), discussed later in this Opinion at Section III.A.iii.

### c. Count III: Retaliation

Plaintiff further alleges that UC retaliated against her by "expelling her from UC, terminating her access to UC's facilities, … killing her research animals purchased with federal funds, disassembling her federally funded experimental setup, and destroying all of

her other federally funded research." Am. Compl., ¶ 91. Once more, all these alleged actions occurred between February and August 2022 as Plaintiff was cooperating with UC's investigation into Crocker's purported misconduct. *Id.* ¶¶ 43–55. As noted above, however, the limitations period began to run during this time because Plaintiff's injuries, such as she claims they are, would have independently given rise to a cause of action against UC for retaliation under Title IX. Even Plaintiff herself appears to acknowledge her injuries in a May 19, 2022 email to Dr. Strasser, in which she called the "shut[ting] down" of the lab and the "abrupt[] terminat[ion]" of her ID access "very unfair treatment" and "punish[ment] for voicing [her] concerns." *Id.* ¶ 51. Had these facts been included in a lawsuit timely filed against UC for retaliation under Title IX, they conceivably would have "'constitut[ed] the [Title IX] violation.'" *Snyder-Hill*, 48 F.4th at 705 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). But as these untimely claims stand currently, the Court is barred from considering those facts in its assessment of Count III.

Plaintiff also asserts alternate theory of retaliation against UC under Count III. Plaintiff contends that UC retaliated against her in September 2022 "by falsifying defamatory allegations against Plaintiff to VUMC … that Plaintiff … had been doing research at UC without the necessary authorization and permissions." Am. Compl., ¶ 92. Because these events occurred within the two-year limitations period, the Court will confine its analysis of the retaliation claim to UC's alleged filing of defamatory allegations against Plaintiff to VUMC and its launching of a "sham investigation" into Plaintiff's suspected academic misconduct.

        iii.    *Are Plaintiff's remaining Title IX claims (Counts II and III) plausible?*

        a.  <u>Count II: Discrimination Based on Sex</u>

The only portion of Count II that survives the initial statute of limitations screening—that UC discriminated against Plaintiff "by defaming and falsely accusing her of wrongdoing to VUMC" because of her sex—nevertheless fails under a plausibility analysis. Am. Compl., ¶¶ 82–83. UC argues that this claim is deficient because it "is devoid of any allegations tying any action on the part of UC to her sex." Doc. 10, PageID 108. The extent of Plaintiff's rebuttal is that the Amended Complaint contains sufficient allegations from which a reasonable inference can be drawn that "UC discriminated against [her] because she is a woman." Doc. 11, PageID 119.

The Court agrees with UC. Title IX makes clear that federally funded institutions must not deny "access to educational benefits and opportunities *on the basis of gender.*" *Davis*, 526 U.S. at 650 (emphasis added). Courts in the Sixth Circuit look to Title VII "as an analog for the legal standards in both Title IX discrimination and retaliation claims." *Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2007). To plead a claim of sex or gender discrimination under Title VII (and consequently Title IX), "the plaintiff must state facts that show that the defendant took adverse action against her, and that … gender [or sex] was a motivating factor." *Beny v. Univ. of Michigan Bd. of Regents*, No. 22-12021, 2023 WL 4409107, at *8 (E.D. Mich. July 7, 2023) (citing *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012)).

Moreover, a prima facie case of sex discrimination under Title VII (and consequently Title IX) exists where a plaintiff establishes: "(1) [she] is a member of a protected class; (2) [she] suffered an adverse employment action; (3) [she] was qualified for the position; and (4)

a similarly situated employee outside the protected class or classes was treated more favorably." *Schoonover v. Hamilton Cnty.*, No. 1:22-cv-767, 2024 WL 645220, at *8 (S.D. Ohio Feb. 15, 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Regarding the fourth element, Plaintiff "must demonstrate that 'all relevant aspects' of her situation are 'nearly identical' to those of the allegedly similarly situated person." *Doe v. Ohio State Univ.*, 239 F. Supp. 3d 1048, 1066 (S.D. Ohio 2017), *on reconsideration in part*, 323 F. Supp. 3d 962 (S.D. Ohio 2018) (quoting *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)); *see also Mitchell v. Toledo Hospital,* 964 F.2d 577, 583 (6th Cir. 1992) ("to be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the [defendant's] treatment of them for it").

A plaintiff asserting a sex discrimination claim need not plead all such facts establishing her prima facie case at the outset. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002). But "elements of a prima facie case are still aspects courts consider when determining the plausibility of a discrimination claim." *Schoonover*, 2024 WL 645220, at *8 (citing *White v. Adena Health Sys.*, No. 2:17-cv-593, 2018 WL 3377087, at * 4 (S.D. Ohio July 11, 2018)). Importantly, the "ordinary rules for assessing the sufficiency of a complaint [still] apply[,]" and courts ultimately assess the plausibility of a discrimination claim by employing "judicial experience and common sense." *Swierkiewicz*, 534 U.S. at 511; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

As disturbing as Plaintiff's allegations regarding the treatment she received at UC are, Plaintiff has not plausibly alleged that UC undertook discriminatory actions post-August 29,

16

2022 "on the basis" of her sex. *Davis*, 526 U.S. at 650. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plaintiff "has offered no allegations of direct or circumstantial evidence indicating that [her] gender [or sex] played any role" in the alleged discriminatory defamation. *Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2017 WL 1134510, at *11 (S.D. Ohio Mar. 27, 2017); *see also Hall v. Lee Coll., Inc.*, 932 F. Supp. 1027, 1033 (E.D. Tenn. 1996) (dismissing a Title IX claim against the defendant college where the plaintiff offered no direct or circumstantial evidence that her suspension was as a result of her gender). This is made all the more apparent by Plaintiff's own admission that "no facts have been established [in this case] yet." Doc. 11, PageID 118. Thus, there is no factual content from which the Court can "draw the reasonable inference that [UC] is liable" for discriminatorily defaming Plaintiff because of her sex. *Iqbal*, 556 U.S. at 678 (*Twombly*, 550 U.S. at 556). While the Court is mindful that Plaintiff need not prove her case at this juncture, the *Iqbal/Twombly* pleading standard nevertheless demands that Plaintiff state "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 56 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). That is all Plaintiff alleges here.

Furthermore, while the Court acknowledges that failure to do so is not necessarily fatal to her claim at this stage, neither has Plaintiff presented a prima facie case of sexual discrimination. Here, Plaintiff has not identified an "incident[] that occurred within the applicable period of limitations," *Beny*, 2023 WL 4409107, at *9, where "a similarly situated [person] outside the protected class … was treated more favorably." *Schoonover*, 2024 WL 645220, at *8. The Court recognizes Plaintiff's general assertion that "Crocker and similarly situated men were treated more favorably than [her]." Am. Compl., ¶ 83. However, those

17

incidents of disparate treatment did not occur within the statutory period, and such conclusory allegations still do not give rise to a reasonable inference that Plaintiff was discriminatorily defamed by UC officials on account of her sex.

Ultimately, the plausibility of Plaintiff's claim for discriminatory defamation "depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (citing *Iqbal*, 556 U.S. at 682). Rather than having "defamed" her, it well could have been the case that UC simply disclosed to VUMC that Plaintiff was under investigation for academic misconduct. Because the "factual allegations in the Amended Complaint do not satisfy any of [the] traditional means of demonstrating gender bias," *Sahm v. Miami Univ.,* 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015), Count II is **DISMISSED WITH PREJUDICE**.

### b. Count III: Retaliation

In what remains of Count III, Plaintiff alleges that UC retaliated against her "by falsifying defamatory allegations against Plaintiff to VUMC" and by conducting a "sham investigation" into suspected academic and research misconduct. Am. Compl., ¶ 92; Doc. 11, PageID 114. Plaintiff avers that "Dr. Strasser falsely reported that Plaintiff … had been doing research at UC without the necessary authorization and permissions." Am. Compl., ¶ 92. Both actions constituting the alleged retaliation—the defamation and the launching of the investigation—occurred within the two-year limitations period, which began on August 29, 2022.

With regard to these averments, the Court finds that Plaintiff has plausibly stated a claim for retaliation under Title IX. While this Court recognizes that the *McDonnell Douglas*

burden-shifting framework for Title IX is an evidentiary standard and *not* a pleading requirement, the Court nonetheless notes that Plaintiff has established a prima facie case of retaliation at this stage. *Doe v. Univ. of Kentucky*, 111 F.4th 705, 716 (6th Cir. 2024). Under this framework, Plaintiff must demonstrate that (1) she engaged in "protected activity," (2) the University "knew of the protected activity," (3) she suffered an "adverse school-related action," and (4) a "causal connection exists" between the cited protected activity and the alleged adverse action. *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020); *see also Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017). This burden is "easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

There appears to be no dispute as to the first two prongs: that Plaintiff was engaged in a protected activity (by cooperating in UC's investigation into Crocker's alleged misconduct) and that UC knew of the protected activity (through various emails and correspondences between Plaintiff and UC officials). As to the third prong, the Court assesses whether the challenged retaliatory action is "adverse" for Title IX purposes and "whether [UC's] action would dissuade a reasonable person from engaging in the protected activity." *Doe*, 111 F.4th at 716 (citing *Gordon*, 686 F. App'x at 320). The adverse action must be "school-related," *id.*, but even a plaintiff who "is not a student" may nevertheless suffer an adverse school-related action. *Doe*, 111 F.4th at 717. School disciplinary proceedings are "plainly" school-related "for Title IX purposes." *Id.*

Here, Plaintiff alleges that in September 2022, UC official Dr. Strasser "falsely and voluntarily reported to VUMC … that Plaintiff had engaged in academic and research misconduct." Am. Compl., ¶ 56. This led to VUMC "informing Plaintiff on October 14, 2022 that her appointment [with VUMC] had been suspended pending the outcome of Dr.

Strasser's sham investigation." Doc. 11, PageID 114. These are adverse, school-related actions that "would [have] dissuade[d] a reasonable person from engaging in … protected activity." *Doe*, 111 F.4th at 716.

As to the fourth and final prong of causation, the Court need only revisit the timeline of facts as alleged. Plaintiff asserts that "throughout the summer of 2022, [she] actively cooperated with the investigation she believed was being conducted into Crocker's behavior." Am. Compl., ¶ 52. On June 22, 2022, Dr. Strasser "demanded evidence of Crocker's misconduct, which Plaintiff provided on June 29, 2022." The alleged—and actionable—discriminatory retaliation in the forms of the defamation and "sham investigation" occurred in September/October 2022, just a few months later. The Sixth Circuit recently affirmed that "temporal proximity alone may provide 'evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.'" *Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *5 (6th Cir. June 1, 2023) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Although additional information would be needed to prevail on this claim, Plaintiff has nevertheless pleaded a prima facie case of retaliation by demonstrating a temporal connection between her protected activity and the alleged retaliation.

The Court reckons with one additional question: if this Court has already dismissed a Title IX discrimination claim (Count II) on the grounds that Plaintiff has not plausibly alleged that the discrimination was on account of her sex, how does this Court now come to the opposite conclusion for the Title IX retaliation claim (Count III)? In answering this, the Court notes the distinction between *evidence* for a claim and *elements* of a claim. Under Count II, Plaintiff pleaded a wide array discriminatory acts in which she contends that similarly situated men were treated differently. But those discrete acts are the very elements of the claim that

form the basis of Count II. This disparate treatment occurred before August 29, 2022, and such instances are therefore barred by the applicable two-year statute of limitations.

However, for Count III, Plaintiff does not invoke these same occurrences as the elements of her claim of retaliation. Rather, these acts provide this Court with factual content from which it can make a reasonable inference that UC retaliated against Plaintiff for her opposition to sexual discrimination. The pre-August 29, 2022 disparate treatment does not, by itself, constitute the elements of the claim of retaliation. It merely suggests, in a manner consistent with the relatively low pleading requirements established under *Twombly* and *Iqbal*, that the retaliation was on the basis of opposition to sexual harassment or discrimination. At bottom, Plaintiff has pleaded enough factual content for this claim to proceed to the next stage of litigation. As such, the Court declines to dismiss Count III. UC's Motion is **DENIED** as to Count III.

### B. Counts IV and V against UC. Violation of Title VII, 42 U.S.C. § 2000e, *et seq*.: Discrimination Based on Sex; Retaliation.

#### i. *Are Plaintiff's Title VII claims time-barred?*

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of" that individual's "sex." *See* 42 U.S.C. § 2000e-2(a)(1). Pursuant to 42 U.S.C. § 2000e–5(e)(1), a charge of discrimination must be filed "within three hundred days…[of] the alleged unlawful employment practice." UC asserts that Plaintiff's Title VII claims (Counts IV and V) are time-barred because she failed to timely file a charge with the Equal Employment Opportunity Commission ("EEOC"). Doc. 10, PageID 105. Here, Plaintiff filed a dual charge of discrimination with the EEOC and the Ohio Civil Rights Commission ("OCRC") against UC

in November 2023. Am. Compl., ¶ 62; Doc. 11-1, PageID 129. Plaintiff maintains that her Title VII claims are timely because the earliest date she contends that she discovered any unlawful employment practice was February 1, 2023. Doc. 11, PageID 114. As explained below, however, neither party is entirely correct.

To bring a claim under Title VII, a person must first file a timely discrimination charge with the EEOC. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.,* 177 F.3d 394, 407 (6th Cir. 1999). The filing period "begins to run when the aggrieved person 'learns of the employment decision itself.'" *Chapman v. Univ. of Toledo*, No. 3:23-CV-1022, 2023 WL 8086742, at *3 (N.D. Ohio Nov. 21, 2023) (quoting *Amini v. Oberlin Coll.*, 259 F.3d 493, 498 (6th Cir. 2001)). The guiding inquiry for when the limitations period begins to run on a claim for employment discrimination is when "employer makes and communicates a *final decision* to the employee. Once the employee is aware or reasonably should be aware of the employer's decision, the limitations period commences." *EEOC v. United Parcel Service, Inc.*, 249 F.3d 557, 561 (6th Cir. 2001) (emphasis added) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)). Thus, the Court confines its analysis to when Plaintiff learned or should have learned of a final employment decision.

UC argues that "all of the events Plaintiff alleges in the Complaint occurred in 2022, more than 300 days before the November 2023 charge filing." Doc. 10, PageID 105. Indeed, to the extent that Plaintiff seeks to find support for her claim based on UC's failure to ameliorate a hostile work environment and address pervasive harassment, or its suspension of Plaintiff's lab, email, and facility access, these employment inactions and decisions occurred beyond the 300 days from the November 2023 charge filing and are therefore barred from this Court's consideration.

22

Nonetheless, Plaintiff submits that she suffered an additional injury that culminated on or about February 1, 2023, when UC cleared Plaintiff of the "defamatory" allegations of academic misconduct which it had previously communicated to VUMC. Doc. 11, PageID 114. To be sure, the filing of these allegations and the subsequent initiation of the alleged "sham" investigation into Plaintiff's academic misconduct occurred in September 2022—well beyond the 300-day timeframe. But it was not until *February 2023* that UC "ma[de] and communicate[d] a *final decision* to" Plaintiff regarding the outcome of the "sham" investigation. *United Parcel Service, Inc.*, 249 F.3d at 561 (emphasis added). Thus, this element of both of Plaintiff's Title VII claims (Counts IV and V) survives an initial screening for timeliness.

ii. *Are Plaintiff's narrowed Title VII claims (Counts IV and V) plausible?*

a. Count IV: Discrimination Based on Sex

What remains of Count IV still does not give rise to a reasonable inference of discrimination based on sex. A "complaint that includes only conclusory allegations of discriminatory intent without supporting factual allegations" fails to state a claim. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012). In reviewing the record, and for the same reasons by which the Court dismisses Count II, the Court finds that Plaintiff has not satisfied the plausibility standard in *Twombly* and *Iqbal.* In the case at bar, there is nothing by way of factual pleading in the Amended Complaint that gives rise to a reasonable inference that would support the legal conclusion that UC discriminated against Plaintiff on the basis of sex. *Id.* at 612–13 (affirming dismissal of discrimination claim under the Fair Housing Act where the allegations of the complaint did not support plausible inference of intentional

discrimination). Therefore, and in conjunction with this Court's finding that amendment would be futile, Count IV is **DISMISSED WITH PREJUDICE**.

### b.  Count V: Retaliation

Plaintiff has plausibly pleaded a claim of retaliation under Title VII. Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee[1] "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). An employee engages in protected activity when she opposes practices that the employee reasonably believes are in violation of Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). The purpose of the anti-retaliation provision is to protect an employee from materially adverse actions for engaging in the identified protected conduct. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775–76 (6th Cir. 2018).

---

[1] The parties dispute whether Plaintiff was an employee of UC. *Cf* Doc. 10, PageID 107 *with* Doc. 11, PageID 120. UC submits that Plaintiff's Title VII claims fail as a matter of law because Plaintiff, as a volunteer, was not employed by UC. Doc. 10, PageID 107. Plaintiff counters that it is both "premature to resolve this question[,]" and that "[t]he economic reality of Plaintiff's position" with UC as a volunteer researcher was such that UC had essentially employed her. Doc. 11, PageID 121; *see also* Am. Compl., ¶¶ 64–65, 98, 99.

"To determine whether a particular defendant is the 'employer' of a plaintiff ... a court must look to whether the alleged employer exercises control over the manner and means of [P]laintiff's work." *Nelson v. Clermont Cnty. Veterans' Serv. Comm'n*, No. 1:11-cv-0335, 2012 WL 893877, at *4 (S.D. Ohio Mar. 15, 2012) (citing *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 611-12 (6th Cir. 2003)); *see Satterfield v. Tennessee*, 295 F.3d 611, 617 (6th Cir. 2002) ("[T]he most important factor" in evaluating whether an entity is an employer of the plaintiff is "the employer's ability to control job performance and employment opportunities of the aggrieved individual.").

Without the benefit of discovery, the Court does not have the information necessary to conclusively dispose of this question. Nonetheless, Plaintiff has pleaded multiple facts suggesting that UC indeed employed her. Plaintiff alleges that "UC had the exclusive right, ability, and means to control [her] access to its academic and research facilities, computer networks, resources, officials, leadership, human resources offices, [and] ... the manner by which [she] conducted her federally funded research." Am. Compl., ¶ 97. Moreover, Plaintiff asserts that "UC assigned professionals to supervise [her] work and to provide her with instruction directly related to the same ..., supplied the instrumentalities, facilities, and tools directly associated with Plaintiff's work, ... [supplied] workplace training and orientations, ... a 'uc.edu' email address, ... [and] a 'Bearcat Badge' to access its facilities." *Id.* These are all indications that UC exercised effective control over the manner and means of Plaintiff's work. Therefore, at this stage in litigation, the Court will presume that Plaintiff was employed by UC.

The Court turns to the elements of a prima facie case of retaliation under Title VII because they are "useful considerations" in assessing the plausibility of Plaintiff's claim at this procedural juncture. *Demers v. Ohio C.R. Comm'n*, No. 2:23-cv-940, 2023 WL 7222842, at *3 (S.D. Ohio Nov. 1, 2023). As outlined above, to succeed on this claim, Plaintiff must eventually demonstrate that: "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by [Defendant] ; (3) thereafter, [Defendant] took an action that was 'materially adverse' to [Plaintiff]; and (4) a causal connection existed between the protected activity and the materially adverse action." *Jones v. Johanns,* 264 Fed. App'x 463, 466 (6th Cir. 2007) (citing *Abbott v. Crown Motor Co., Inc.,* 348 F.3d 537, 542 (6th Cir. 2003), and *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67–68 (2006) (modifying the third element to require a "materially adverse action" rather than an "adverse employment action")).

All that Plaintiff is required to do at this stage—and what she has done—is plausibly allege retaliation for opposition to sexual harassment. The Court finds that Plaintiff's allegations "closely track the elements of a prima facie case" and therefore support a reasonable inference of UC's wrongdoing. *Demers*, 2023 WL 7222842, at *4. Here, Plaintiff maintains that she complained about what she perceived to be a hostile work environment and pervasive sexual harassment. Am. Compl., ¶¶ 40, 43, 45. Further, Plaintiff asserts that she cooperated with UC regarding its investigation into sexual harassment and a hostile work environment. *Id*. ¶ 52. Further still, Plaintiff avers that UC filed defamatory allegations against her to VUMC and launched a "sham investigation" into her purported academic misconduct as a result of her cooperation with UC's investigation. ¶ 127. Lastly, all these occurrences are temporally proximate to each other such that Plaintiff has plausibly alleged a causal link. In

other words, Plaintiff "has alleged enough for the claim to proceed to the next phase of the litigation." *Taliaferro v. Centennial Surgical Clinic, LLC*, No. 3:24-cv-00454, 2025 WL 2425752, at *4 (M.D. Tenn. Aug. 20, 2025), *report and recommendation adopted sub nom.*, 2025 WL 2602360 (M.D. Tenn. Sept. 9, 2025). As such, UC's Motion is **DENIED** as to Count V.

### C. Count VI against Dr. Strasser and the Doe Defendants. Violation of the Fourteenth Amendment, 42 U.S.C. §1983: Denial of Procedural Due Process.

In Count VI, Plaintiff alleges Dr. Strasser and unidentified Doe Defendants employed at UC violated her constitutional rights by denying her procedural due process rights and protections. Plaintiff alleges that Defendants wrongfully "suspended [her] from accessing UC's facilities and resources, her research, and other benefits of attending UC" in March 2022. Am. Compl., ¶ 117. Plaintiff further asserts that on August 1, 2022, Defendants again wrongfully suspended her "based on alleged misconduct" by locking her out of UC's computer and information technology networks and terminating her email access. *Id.* ¶ 118. Further still, Plaintiff alleges that Strasser defamed her by lodging and communicating false allegations of academic misconduct and by launching a "sham" investigation "without (a) informing Plaintiff of the nature of the allegations against her and (b) allowing her to defend herself from the same." *Id.* ¶ 125. These actions, according to Plaintiff, "irreparably harmed [Plaintiff's] academic and professional standing among her peers." *Id.* ¶ 119.

Defendant Strasser categorically rejects these allegations. Strasser moves to dismiss the Amended Complaint against her in its entirety pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). Doc. 9, PageID 90. Strasser submits that this Court lacks jurisdiction over Count VI, that Count VI is barred by the applicable statute of limitations, that the Amended

26

Complaint fails to state a claim upon which relief can be granted against Strasser individually, and that Strasser is entitled to qualified immunity. *Id.*

### *i. When did Plaintiff have a "complete and present" claim?*

The Court need only address whether Plaintiff's claim is time-barred because the resolution of that question would dispose of the claim in its entirety. The Court finds that Count VI is time-barred because Plaintiff had a cognizable claim against Strasser and the Doe Defendants for more than two years before she sued them in their individual capacities.

Section 1983 gives plaintiffs a right to seek damages from any "person" who, while acting "under color of" state law, "subjects" the plaintiffs "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. Under current Sixth Circuit authority, when a claim arising under § 1983 is brought against a person, federal courts must look to the statute of limitations for personal injury claims in the state for determining when the claim must be brought. *Browning v. Pendleton*, 869 F.2d 989, 991 (6th Cir. 1989). The statute of limitations under Ohio law for actions brought pursuant to 42 U.S.C. § 1983 is two years. *Id.* at 990. "Ordinarily, the limitations period starts to run 'when the plaintiff knows or has reason to know of the injury which is the basis of his action'"—the familiar "discovery rule." *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997) (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)). Under the "discovery rule," this Court "looks to what event should have alerted the typical lay person to protect his or her rights." *Id.* (quoting *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991)). Accordingly, to determine when Plaintiff had a "complete and present cause of action under § 1983[,]" *Reguli v. Russ*, 109 F.4th 874, 880 (6th Cir. 2024), the Court must assess "what injuries formed the basis of her constitutional claims—that is, what injuries should have made [Plaintiff] aware

that her rights had been violated and therefore started the clock on her statute of limitations." *Printup v. Dir., Ohio Dep't of Job & Fam. Servs.*, 654 F. App'x 781, 785 (6th Cir. 2016).

The Court "start[s] by identifying the elements of [Plaintiff's] claim." *Reguli*, 109 F.4th at 880. To proceed on a procedural-due-process claim under § 1983, a party must allege "that a wrongful process led to an invalid result." *Accord v. Anderson Cnty., Tennessee*, No. 22-5206, 2022 WL 16825411, at *3 (6th Cir. Nov. 8, 2022); *see also Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010) (requiring parties to prove that the state did not afford "adequate procedural rights" before depriving them of a life, liberty, or property interest). There are several wrongful processes alleged here. The first wrongful process is the facility and resource suspension that occurred in March 2022. *Id*. ¶ 51. The second wrongful process is the network and email suspension that occurred on August 1, 2022.[2] *Id*. ¶ 60. The third wrongful process appears to be a continuation of several allegedly wrongful acts beginning in September 2022. The facts as alleged constituting the third wrongful process concern Strasser and the Doe Defendants' (1) launching of a procedurally flawed investigation into Plaintiff's alleged research misconduct (September 2022); (2) communication of defamatory allegations to VUMC regarding Plaintiff's alleged research misconduct (October 2022); and (3) prevention of Plaintiff from defending herself in the ensuing investigation (at least through February 2023). *Id*. ¶¶ 61–62, 65–66, 136–37.

The parties disagree as to when in this timeline Plaintiff had a "complete and present" cause of action. *Reguli*, 109 F.4th at 880. Plaintiff asserts that she did not discover, nor could she have discovered, her injuries until February 2023. Doc. 11, PageID 114. Strasser urges

---

[2] The Court understands this August 1, 2022 incident to be the second "suspension" which Plaintiff alludes to in her Amended Complaint. *Am. Compl.*, ¶ 130 ("Dr. Strasser and the Doe Defendants suspended Plaintiff in the manner described in this Complaint based on alleged academic misconduct."). This is the only reasonable inference to be made without more information as to what "the manner described in this Complaint" refers to.

this Court to find that Plaintiff had a complete and present cause of action sometime before November 25, 2022. Doc. 12, PageID 141. As the alleged wrongdoing between the first and third wrongful processes spans almost the course of a year, the Court must parse through the record to determine when Plaintiff had knowledge of facts, or had reason to know of facts, giving rise to a cognizable claim under Section 1983. Using the original filing date for Plaintiff's complaint of August 29, 2024 as a benchmark, the Court finds that the first (March 2022) and second (August 1, 2022) suspensions occurred just beyond the applicable two-year statute of limitations and are therefore barred from consideration.

As to the third alleged wrongful process, Plaintiff maintains the controlling date should be August 29, 2022—two years before she filed her initial Complaint. Doc. 11, PageID 115. Although Plaintiff filed an Amended Complaint on November 25, 2024, she contends that the Amended Complaint "relates back" to the original for purposes of preserving the limitations period. *Id.* Opposingly, Strasser submits that the governing date should be November 25, 2022. Doc. 12, PageID 141. This date is exactly two years before Plaintiff amended the Complaint to assert this § 1983 claim "against Dr. Strasser in her *individual* capacity." Doc. 9, PageID 95 (emphasis added). Strasser asserts that Plaintiff filed her original Complaint on August 29, 2024 against Dr. Strasser and the Doe Defendants for monetary damages "in their *official capacities* as public employees acting under color of state law."[3] Compl., ¶ 3 (emphasis added). However, a state or public official "cannot be held liable for monetary damages in their official capacities because [such] claims … are barred by the

---

[3] In amending her Complaint, Plaintiff changed paragraph 3 by striking "in their official capacities as public employees" and now asserts that Dr. Strasser acted "individually." *Cf.* Compl., ¶ 3 *with* Am. Compl., ¶ 3. Plaintiff similarly deleted that Dr. Strasser was a "public official acting under color of state law" from former paragraph 8. *Cf.* Compl., ¶ 8 *with* Am. Compl., ¶ 8.

Eleventh Amendment." *Shine-Johnson v. Chambers-Smith*, No. 2:22-cv-3236, 2023 WL 8372816, at *1 (S.D. Ohio Dec. 4, 2023).

The Court agrees with Strasser. The Amended Complaint does "not relate back" to the original Complaint because the original Complaint "expressly named the [D]efendants in their official capacities only, and therefore did not place [Defendants] on notice of possible individual liability." *Shaw v. Pfeiffer*, 295 F. App'x 735, 735 (6th Cir. 2008). As such, only events claimed to violate due process that took place after November 25, 2022 can animate this claim. The alleged defamation and the initiation of the investigation into misconduct occurred between September 2022 and October 14, 2022, and are therefore time-barred.

This brings us to the last element of the third wrongful process. The Court considers whether Strasser's failure to "allow Plaintiff to defend herself from allegations of [academic] wrongdoing" constitutes a continuing violation of her procedural due process rights until she was cleared of the charge in February 2023. Am. Compl., ¶ 124.

The continuing violation doctrine is "an exception to the ordinary rule regarding the commencement of a statute of limitations, [that] allows for tolling based on continuing unlawful acts." *Norman v. Granson*, No. 18-4232, 2020 WL 3240900, at *2 (6th Cir. Mar. 25, 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982)). "A continuing violation occurs over several incidents that are not themselves actionable." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)). The Sixth Circuit recognizes two categories of continuing violations: "(1) 'those alleging serial violations' and (2) 'those identified with a long-standing and demonstrable policy of discrimination.'" *Id.* (citing *Sharpe v. Cureton*, 319 F.3d 259, 266 (6th Cir. 2003)). For either category, three requirements must be established: "(1) 'the defendant's wrongful conduct must continue after the precipitating

event that began the pattern,' (2) 'injury to the plaintiff must continue to accrue after that event,' and (3) 'further injury to the plaintiff[ ] must have been avoidable if the defendants had at any time ceased their wrongful conduct.'" *Id.* (citing *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999)). The doctrine is "rarely" applied in § 1983 cases. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003).

Here, the Court declines to apply the rarely invoked continuing violation doctrine to toll the limitations period. There are only three identified incidents that Plaintiff has alleged which constitute the "sham" investigation: (1) Strasser's launching of it without informing Plaintiff of the same or of her due process rights (September 2022), (2) VUMC's suspension of Plaintiff from access to VUMC's faculties pending the outcome of Strasser's investigation at UC (October 14, 2022); and (3) the clearing of her name (February 2023). Am. Compl., ¶¶ 61, 62, 65–66. Plaintiff appears to concede that she was made aware of the investigation at least as early as October 14, 2022, when Dr. Rathmell of VUMC communicated to her that Plaintiff was under investigation. *Id.* ¶ 62. This event—not when she was cleared of the investigation in February 2023—is what "should have alerted [Plaintiff] to protect … her rights." *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997). Plaintiff cannot toll the limitations period because she has not established that the clearing of her name constituted a separate incident of "wrongful conduct." *Norman*, 2020 WL 3240900, at *2. Nor has Plaintiff demonstrated how her injury "accrue[d]" between October 14, 2022 and February 2023.

Because Plaintiff's claim is barred by the state of limitations, the Court need not address whether Strasser is entitled to qualified immunity. Therefore, consistent with this

Court's finding that amendment would be futile, Count VI is **DISMISSED WITH PREJUDICE**.

IV.    CONCLUSION

For the reasons set forth herein, the Court **GRANTS** Defendant Strasser's Motion to Dismiss (Doc. 9) and **DISMISSES** Count VI **WITH PREJUDICE**. The Court **GRANTS IN PART, DENIES IN PART** Defendant UC's Motion to Dismiss (Doc. 10) and **DISMISSES** Counts I, II, and IV **WITH PREJUDICE**. Counts III and V remain viable claims against UC.

**IT IS SO ORDERED.**

September 30, 2025
                                            Jeffery P. Hopkins
                                            United States District Judge